**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OUACHITA RIVERKEEPER, INC., *et al.*, <br><br>    Plaintiffs, <br><br>      v. <br><br> THOMAS P. BOSTICK, Lieutenant General, U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers, *et al.*, <br><br>    Defendants, <br><br> EL DORADO WATER UTILITIES, *et al.*, <br><br>    Defendant-Intervenors. | **Civil Action No. 12-803 (CKK)** |

**MEMORANDUM OPINION**
(April 10, 2013)

Plaintiffs Ouachita Riverkeeper, Inc., and Save the Ouachita, Inc., (collectively "Plaintiffs"), filed suit against Lieutenant General Thomas P. Bostick in his official capacity as the Commanding General and Chief of Engineers for the United States Army Corps of Engineers (the "Corps"), as well as the Corps itself (collectively "Defendants") alleging the Corps improperly verified that the construction of a wastewater pipeline in southern Arkansas was authorized under two nationwide discharge permits issued by the Corps pursuant to the Clean Water Act. El Dorado Water Utilities, Lion Oil Co., Great Lakes Chemical Co., and El Dorado Chemical Co. (collectively "Defendant-Intervenors), each of which intend to discharge effluent through the pipeline, subsequently intervened with the Court's permission. Presently before the Court are the parties' cross-motions for summary judgment. Upon consideration of the

pleadings,[1] the administrative record, and the relevant legal authorities, the Court finds the Plaintiffs have standing and their claims are not yet moot. However, the Corps did not err in finding construction of the pipeline was authorized under nationwide permits 7 and 12. Accordingly, the Plaintiff's [43] Motion for Partial Summary Judgment is DENIED, the Defendant-Intervenors' [61] Cross-Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, and the Defendant's [63] Cross-Motion for Summary Judgment is GRANTED.

## I. BACKGROUND

### A.    The Clean Water Act & Nationwide Permits

In order to restore and maintain the "chemical, physical and biological integrity" of the nation's waters, the Clean Water Act generally prohibits the discharge of any "pollutant" into the navigable waters of the United States. *See* 33 U.S.C. §§ 1251(a)(1), 1311. The term "navigable waters" means "the waters of the United States," which by regulation includes certain wetlands. 33 U.S.C. § 1362(7); 33 C.F.R. § 328.3(a)(2), (3), (5). The Secretary of the Army, through the Corps, may issue permits authorizing the discharge of "dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344(a), (d). Two types of discharge permits are relevant to this case: individual permits and nationwide permits. Individual permits require a detailed description of the proposed activity, an environmental assessment or impact statement pursuant to the National Environmental Policy Act of 1969 ("NEPA"), and are subject to a public notice and comment period before the Corps makes a determination as to whether or not the permit should be issued. 33 C.F.R. §§ 325.1, 325.2; *see generally* 33 C.F.R. Parts 323, 325

---

[1] Pls.' Mot. for Partial Summ. J., ECF No. [43]; Def.-Intervs.' Cross-Mot. & Opp'n, ECF No. [61]; Defs.' Cross-Mot. & Opp'n, ECF Nos. [63-64]; Pl.'s Reply &Opp'n to Cross-Mots., ECF No. [67]; Defs.' Reply, ECF No. [70]; Def.-Intervs.' Reply, ECF No. [71].

(setting forth policies and procedures governing review of applications for individual permits).

As an alternative to individual permits, the Secretary may issue discharge permits on a "State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material," if the Secretary determines that the activities in each category (1) are "similar in nature," (2) "will cause only minimal adverse environmental effects when performed separately," and (3) "will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1); *see generally* 33 C.F.R. Part 330 (setting forth the policy and procedures for issuing, modifying, suspending, or revoking nationwide permits). Nationwide permits, or NWPs, are valid for a period of five years. *Id.* § 1344(e)(2). Before issuing a nationwide permit, the Corps conducts a "predictive environmental analysis," Defs.' Cross-Mot. at 5, of the potential adverse environmental effects of the activity at issue, prepares an environmental impact statement as required by NEPA, 42 U.S.C. § 4332(C), and conducts the impact analysis specified in Subparts C through F of the Environmental Protection Agency's Clean Water Act Section 404(b)(1) guidelines, 40 C.F.R. Part 230. A.R. 50 (2007 Decision Doc., NWP 12); *see id.* at 66-68 (outlining the Corps' environmental impact analysis). The Corps also conducts a "public interest review" of the factors set forth in 33 C.F.R. § 320.4(a)(1), including conservation, economics, "considerations of property ownership," and "in general, the need and welfare of the people." *See* A.R. 68-74. After conducting the relevant analysis, the Corps publishes a proposal to issue (or reissue, where relevant) the nationwide permit in the Federal Register. 33 C.F.R. § 330.1(b); *see* 71 Fed. Reg. 56,258 (Sept. 26, 2006) (Proposal to Reissue & Modify Nationwide Permits).

The Corps subsequently memorializes its analysis, including any response to public comments, in the Federal Register as well as a decision document for each nationwide permit.

*See generally* A.R. 50-86; *id.* at 105-211 (2007 Reissuance of Nationwide Permits).  After a nationwide permit issues (or reissues), a Division Engineer[2] has "discretionary authority to modify, suspend, or revoke NWP authorizations for any specific geographic area, class of activities, or class of waters within his division, including on a statewide basis, by issuing a public notice or notifying the individuals involved."  33 C.F.R. § 330.5(c)(1); *see* A.R. 87-104 (Suppl. to 2007 Decision Doc., NWP 12).

"In most cases, permittees may proceed with activities authorized by NWPs without notifying the [District Engineer]."  33 C.F.R. § 330.1(e)(1).  However, some permits may require the permittee to submit "pre-construction notice" to the relevant District Engineer in order to verify the proposed activity may proceed under a nationwide permit.  *Id.* § 330.1(d); A.R. 51.

> The [District Engineer] will review the notification and determine if the individual and cumulative adverse environmental effects are more than minimal. If the adverse effects are more than minimal the [District Engineer] will notify the prospective permittee that an individual permit is required or that the prospective permittee may propose measures to mitigate the loss of special aquatic sites, including wetlands, to reduce the adverse impacts to minimal.  The prospective permittee may elect to propose mitigation with the original notification.  The [District Engineer] will consider that proposed mitigation when deciding if the impacts are minimal.   The [District Engineer] shall add activity-specific conditions to ensure that the mitigation will be accomplished.   If sufficient mitigation cannot be developed to reduce the adverse environmental effects to the minimal level, the [District Engineer] will not allow authorization under the NWP and will instruct the prospective permittee on procedures to seek authorization under an individual permit.

33 C.F.R. § 330.1(e)(3).  The District Engineer retains the authority to modify, suspend, or revoke authorization under a nationwide permit even after issuing written verification for a specific activity.  *Id.* § 330.5(d)(1).

---

[2]  The territory subject to the jurisdiction of the Army Corps of Engineers is divided into nine divisions, each of which may be further divided into a number of districts.  Map of Divisions & Districts, *available at* http://www.usace.army.mil/Locations.aspx (last accessed Apr. 8, 2013).

In accordance with these procedures, on March 12, 2007, the Corps reissued all existing nationwide permits, including the two permits at issue here: nos. 7 and 12.  *See generally* A.R. 105-211 (2007 Reissuance of Nationwide Permits); A.R. 1-32 (2007 Decision Doc., NWP 7); A.R. 50-86 (2007 Decision Doc., NWP 12).  Subject to pre-construction notification, nationwide permit 7 "authorizes structures or work in navigable waters of the United States, as well as discharges of dredged or fill material into waters of the United States for activities related to the construction of outfall structures and associated intake structures that are in compliance with Section 402 of the Clean Water Act."  A.R. 13.  Nationwide permit 12 authorizes "[a]ctivities required for the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States, provided the activity does not result in the loss of greater than 1/2 acre of waters of the United States."  A.R. 50.  "Utility lines," include any pipeline "for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose."  *Id.*

The 2007 Reissuance of Nationwide Permits defines "loss of waters" as: "[w]aters of the United States that are permanently adversely affected by filling, flooding, excavation, or drainage because of the regulated activity."  A.R. 209.  "Permanent adverse effects include permanent discharges of dredged or fill material that change an aquatic area to dry land, increase the bottom elevation of a waterbody, or change the use of a waterbody."  *Id.*  Pre-construction notification is required under NWP 12 if, among other things, "the activity involves mechanized land clearing in a forested wetland for the utility land right-of-way."  A.R. 55.  The district engineer may "condition the NWP authorization to require compensatory mitigation to offset losses of waters of the United States and ensure that the net adverse effects on the aquatic environment are minimal."  *Id.* at 60-61.  However,

> The acreage of loss of waters of the United States is a threshold measurement of the impact to jurisdictional waters for determining whether a project may qualify for an NWP; it is not a net threshold that is calculated after considering compensatory mitigation that may be used to offset losses of aquatic functions and services.

A.R. 209.  Pursuant to General Condition 24 prohibits the use of multiple nationwide permits to authorize a "single and complete project," "except when the acreage loss of waters of the United States does not exceed the highest specified acreage limit of the NWPs used to authorize the single and complete project."  A.R. 0002, 0115.  A "single and complete project" for purposes of linear projects is comprised of "all crossings of a single water of the United States (i.e., a single waterbody) at a specific location."  33 C.F.R. § 330.2(i).

> For linear projects crossing a single waterbody several times at separate and distant locations, each crossing is considered a single and complete project. However, individual channels in a braided stream or river, or individual arms of a large, irregularly shaped wetland or lake, etc., are not separate waterbodies, and crossings of such features cannot be considered separately.

*Id.*

The Corps reauthorized certain nationwide permits in February 2012.  77 Fed. Reg. 10,184 (Feb. 21, 2012).  The Corps did not modify the text of nationwide permits 7 or 12 in any manner relevant to this proceeding.  But, in response to public comment, the Corps clarified in the Reissuance document that

> Mechanized landclearing of a forested wetland in a utility line right-of-way may only result in a conversion of wetland type, and not result in permanent loss of waters of the United States.  District engineers may require compensatory mitigation to offset permanent losses of wetland functions when such mechanized landclearing occurs in forested wetlands.

77 Fed. Reg. 10195.

B.    *Defendant-Intervenors' Pipeline Project*

On June 14, 2010, Defendant-Intervenor El Dorado Water Utilities submitted a permit

6

application under Section 404 of the Clean Water Act to the Vicksburg District of the Corps. A.R. 434-565.   The application sought verification from the Corps that a joint pipeline construction project proposed to occur in El Dorado, Arkansas, was permitted under nationwide permits 7 and 12.  A.R. 434.  The application explained that the purpose of the pipeline is to "to connect three industries and the City of El Dorado through a pipeline which will transport treated wastewater to the Ouachita River."  *Id.*  "The pipeline will cover a length of approximately 23.5 miles and require a 50 foot wide cleared right-of-way,"[3] and "[a]n effluent diffuser will be installed at the pipeline terminus on the bottom of the Ouachita River."  *Id.*  The applicant identified more than thirty wetland areas that would be crossed by the pipeline and at least twenty-nine that would require mitigation for loss of wetland function.  A.R. 551-552.

The Corps verified that based on the application, the "permit requirements for the proposed wastewater pipeline will be authorized by Nationwide Permit No. 12, and the proposed outfall structure will be authorized by Nationwide Permit No. 7."  A.R. 706.  The Corps found that the construction activities proposed by the application "result in no permanent loss of wetlands," although "the clearing and establishment of a permanent 30-foot right-of-way will result in the conversion of forested wetlands to emergent vegetation or scrub/shrub wetlands for which compensatory mitigation is necessary."  A.R. 1162.  Therefore, the Corps ordered the applicant to mitigate the conversion of 16.6 acres of wetlands by purchasing 163 credits from the Lower Cutoff Creek Mitigation Bank.[4]  *Id.*  The Corps noted that the verification "is valid until

---

[3] The pipeline itself will only require a 30-foot permanent right-of-way, but an additional 20-foot right-of-way was acquired to accommodate equipment and materials during construction. A.R. 1161.  The Corps assumed a 50-foot right-of-way for permitting purposes.  *Id.*

[4] A wetlands mitigation bank is a wetland area that has been restored, established, enhanced or preserved, which is then set aside to compensate for future conversions of wetlands for development activities.  Permittees, upon approval of

the NWP is modified, reissued, or revoked," and that "[a]ll of the existing NWPs are scheduled

to be modified, reissued, or revoked prior to March 18, 2012." A.R. 706.

In May 2012, the El Dorado Water Utilities submitted additional permitting information

to the Corps in light of revisions to the proposed route for the pipeline. *See generally* A.R. 749-

819; *see id.* at 753-54 (summarizing pipeline route changes). The Corps subsequently approved

the request to modify the authorization, noting that the revised pipeline project would impact, but

cause no permanent loss, to a total of 23.65 acres of wetlands. A.R. 1162. To offset the

increased effect on forested wetlands, the Corps required the applicant to purchase an additional

78 credits from the mitigation bank. *Id.*

### C.    Procedural History

The Plaintiffs filed suit on May 17, 2012. Compl., ECF No. [1]. The Defendants

subsequently moved to transfer the case to the United States District Court for the Western

District of Arkansas. Defs.' Mot. to Transfer, ECF No. [15]. After the Corps modified the

authorization in light of the proposed route change for the pipeline, the Plaintiffs filed an

Amended Complaint challenging the modified authorization. *See generally* Am. Compl., ECF

No. [42]. Simultaneously, the Plaintiffs filed a partial motion for summary judgment, addressing

only their claims as they relate to the authorization of the project under NWP 12. Pls.' Mot.,

ECF No. [43]. In response, the Defendants filed a motion to stay briefing of the Plaintiffs'

motion pending the Court's decision on the Defendants' motion to transfer and the filing of the

---

regulatory agencies, can purchase credits from a mitigation bank to meet their
requirements for compensatory mitigation. The value of these "credits" is
determined by quantifying the wetland functions or acres restored or created. . . .
Mitigation banking is performed "off-site,' meaning it is at a location not on or
immediately adjacent to the site of impacts, but within the same watershed.

Envtl. Prot. Agency, Wetlands Compensatory Mitigation 2 (2003), *available at*
http://water.epa.gov/lawsregs/guidance/wetlands/upload/2003_05_30_wetlands_CMitigation.pdf

Administrative Record.  Defs.' Mot. to Stay, ECF No. [49].  The Court temporarily stayed the briefing schedule for the Plaintiffs' motion while the parties briefed the Defendants' motion to stay.

While the Defendants' motion to stay was pending, the Plaintiffs sought a preliminary injunction.  Pls.' Mot. for Prelim. Inj., ECF No. [53].  During an on-the-record conference call, in lieu of adjudicating the Plaintiffs' motion, the parties agreed to expedited briefing of the Plaintiffs' motion for summary judgment and any cross-motions from the Defendants and Defendant-Intervenors.  1/15/13 Minute Order.  The Court thus denied the Plaintiffs' motion for a preliminary injunction, and set a schedule for the parties to file the Administrative Record and brief dispositive motions.  *Id.*; Sched. & P. Order, ECF No. [55].  The Court also denied the Defendants' motion to transfer.  1/29/13 Mem. Op. & Order, ECF No. [60].  The Defendants and Defendant-Intervenors filed cross-motions for summary judgment in accordance with the schedule set by the Court.  Defs.' Mot., ECF No. [63]; Def.-Intervs.' Mot., ECF No. [61].  All three dispositive motions are now fully briefed and ripe for consideration by the Court.

## II.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment.  *See Liberty Lobby*, 477 U.S. at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment." *Id.*

An agency's decision may be arbitrary or capricious if: (i) its explanation runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise; (ii) the agency entirely failed to consider an important aspect of the problem or issue; (iii) the agency relied on factors which Congress did not intend the agency to consider; or (iv) the decision otherwise constitutes a clear error of judgment. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010). This standard of review is highly deferential to the agency; a court need not find that the agency's decision is "the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instance in judicial proceedings." *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983). Plaintiffs, as the party challenging the agency action, bear the burden of proof. *Abington Crest Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 722 (D.C. Cir. 2009). In assessing the merits of Plaintiffs' claims, the Court begins with the presumption that the Corps' action was valid. *Grid Radio v. Fed. Commc'ns Comm'n*, 278 F.3d 1314, 1322 (D.C. Cir. 2002).

## III. DISCUSSION

Before reaching the merits of the Plaintiffs' challenge to the modified authorization of the pipeline, the Court shall address two jurisdictional issues raised by the Defendant-Intervenors: whether the Plaintiffs have standing to challenge the modified authorization, and whether the case is now moot. The Court finds at least one Plaintiff organization has standing to challenge the Corps' decision and the case is not yet moot, therefore the Court has jurisdiction to evaluate the Plaintiffs' claims. Turning to the merits, the Plaintiffs failed to meet their burden to show

that the Corps' authorization of the pipeline under nationwide permits 7 and 12 was arbitrary and capricious, thus the Corps was under no obligation to conduct an environmental assessment or to complete an environmental impact statement for the pipeline project.    Accordingly, the Defendants and Defendant-Intervenors are entitled to summary judgment.

A.    *The Plaintiffs Have Standing to Challenge the Corps' Authorization of the Pipeline Project*

The Defendant-Intervenors argue that the Plaintiffs lack constitutional standing to challenge the Corps' verification of the pipeline project under nationwide permits 7 and 12.  "[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Idaho ex rel. Idaho Pub. Utilities Comm'n v. Interstate Commerce Comm'n*, 35 F.3d 585, 590 (D.C. Cir. 1994) (citation omitted).   The Plaintiff-organizations must establish associational standing by demonstrating that (1) "at least one member of each association would have standing to sue in its own right," (2) "the interests they seek to protect are germane to their purpose," and (3) "neither the claim asserted nor the relief requested requires that an individual member participate in this suit." *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 5 n.2 (D.C. Cir. 2011).   "[T]he irreducible constitutional minimum of standing contains three elements":   (1) injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a decision in the plaintiff's favor.   *Id*. (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

In support of their motion for summary judgment, the Plaintiffs submitted declarations from two members of the Plaintiff organizations.  Decl. of K. Stegall, ECF No. [43-8]; Decl. of R. Calaway, ECF No. [43-9].   Kent Stegall, the President of Save the Ouachita and founding member of Ouachita Riverkeeper, indicated that he sightsees, fishes, and hunts in the wetlands

through which the pipeline will cross.  Stegall Decl. ¶ 17.  Mr. Stegall expressed concerns that "the construction and operation of the proposed pipeline will disrupt the presence of game in the area and disturb my enjoyment of" hunting and fishing in the area.  *Id.* at ¶ 19.  Mr. Stegall further indicated he was concerned that "spills and leaks from the proposed pipeline will disturb [his] enjoyment of fishing and hunting in the impacted areas."  *Id.* at ¶ 20.

Ralph Calaway, a member of Save the Ouachita, explained that the pipeline will pass within one hundred feet of his property, and that he is concerned potential leaks from the pipeline will harm the animals he keeps on his property and otherwise contaminate his property. Calaway Decl. ¶¶ 7-8.  He explained that chemical leaks have occurred from other underground pipelines running near his property, and one such leak killed a stand of trees near his property. *Id.* at ¶ 7.  Mr. Calaway also stated his concern that clear-cutting the right of way for the pipeline and potential leaks will impair the habitat of game he hunts and generally disturb his "enjoyment of the area's beauty, wildlife, and wetland ecosystem."  *Id.* at ¶ 9.

The Defendant-Intervenors allege that neither Mr. Stegall nor Mr. Calaway have proven they suffered injuries-in-fact or that such injuries are redressable, but do not otherwise challenge their individual standing or the Plaintiffs' associational standing.  As set forth below, the Court finds the Mr. Calaway would have constitutional standing to sue in his own right, thus Save the Ouachita has standing to challenge the Corps' action in this case.  Because Save the Ouachita has standing, the Court need not decide whether Ouachita Riverkeeper also has standing because it makes no difference to the merits of the case.  *Ry. Labor Execs.' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993).

1.     Injury-In-Fact

> To establish injury-in-fact in a "procedural injury" case, [plaintiffs] must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff.  In other words, petitioners must be seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs.  We have held that [a] violation of the procedural requirements of a statute is sufficient to grant a plaintiff standing to sue, so long as the procedural requirement was designed to protect some threatened concrete interest of the plaintiff.

*City of Dania Beach v. Fed. Aviation Admin.*, 485 F.3d 1181, 1185 (D.C. Cir. 2007) (citations omitted).  Although their argument shifts to some degree between their opening and reply briefs, the Defendant-Intervenors do not contest (and the Court finds no reason to doubt) that the public notice and environmental assessment requirements for individual discharge permits were designed to protect the interests the Plaintiffs claim are threatened by the pipeline.  *See id.* ("[T]he purpose of NEPA is to integrate environmental review into the agency decisionmaking process to ensure that environmental values and consequences have been considered during the planning stage of agency actions.") (citation omitted).   Instead, the Defendant-Intervenors in essence argue that the Plaintiffs have failed to establish standing because they did not submit any evidence demonstrating any members of the Plaintiff organizations have *already suffered* a concrete injury attributable to the pipeline.   Def.-Intervs.' Reply at 8 ("Declarations, such as those offered by Riverkeeper, are rejected as speculative when nothing has yet occurred that has caused an injury to the plaintiff.").

For "probabilistic event[s]," such as a pipeline leak, "almost any act . . . merely affects probabilities."  *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996).  However, courts do not construe "the customary rejection of 'speculative' causal links, as ruling out all probabilistic injuries."  *Id.* (citation omitted).  For example, in *Idaho*, the court held that the state of Idaho had standing to challenge the conditional authorization of salvage activities

relating to abandoned railroad tracks, based entirely on the state's allegation that the salvage activities may pollute surrounding lands by disturbing contaminants in the soil surrounding the tracks. 35 F.3d at 591. Both the risk of contamination and the likelihood of the railroad engaging in salvage activities were probabilistic, but the court found the state had standing to challenge the conditional authorization of salvage activities. *Id.*

Thus, the lack of past harm attendant to construction of the pipeline is not fatal to the Plaintiffs' claim of standing in this case. It is undisputed that the presence of the pipeline near Mr. Calaway's property creates an increased risk of leaks which may damage Mr. Calaway's property and harm his livestock. At least one other pipeline near his property has leaked in the past, causing environmental damage, demonstrating that this concern is not entirely hypothetical or speculative. The pipeline at issue poses as "distinct risk" to Mr. Calaway's particularized interest given the proximity of the pipeline to his property. This increased susceptibility to the harms identified in Mr. Calaway's affidavit is sufficient to satisfy the injury requirement for constitutional standing. *City of Dania Beach*, 485 F.3d at 1186.

### 2.   Redressability

The Defendant-Intervenors further argue that Plaintiffs lack standing in that any injury-in-fact that may be identified cannot be redressed by the Court. In relevant part, the Defendant-Intervenors suggest that "there is no relief that the Corps or this Court could offer to address a future pipeline spill." Def.-Intervs.' Reply at 8.[5] "[I]t makes no sense to [the Court] that

---

[5] The Defendant-Intervenors make a number of new arguments regarding the sufficiency of the Plaintiffs' affidavits in their Reply brief, including that "[n]either of the permits that are the subject of this appeal have anything to do with pipeline spills," and that the Plaintiffs "failed to identify what wetland areas are of concern to them." Def.-Intervs.' Reply at 8-9. By failing to raise these arguments in their initial motion, the Defendant-Intervenors forfeited these contentions and the Court need not address the arguments. *Am. Wildlands v. Kempthorne*, 530

[Plaintiffs'] standing to seek judicial review can be vitiated by [Defendant]-intervenors' haste to construct the pipeline under certificates which, though final, were then under direct . . . attack and subject . . . to the possibility of judicial reversal." *Moreau v. FERC*, 982 F.2d 556, 566 (D.C. Cir. 1993) (citation omitted).   Moreover, the Defendant-Intervenors' argument misconstrues the redressability requirement in cases arising from procedural defects.   "[T]he Supreme Court has made clear that neither the causation requirement nor the redressability requirement for constitutional standing should hinder enforcement of 'procedural rights,' such as the right to require an agency to prepare an environmental impact statement." *Idaho*, 35 F.3d at 591.  Furthermore,

> There is this much truth to the assertion that "procedural rights" are special:  The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.  Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Lujan*, 504 U.S. at 573 n.7.  Plaintiffs asserting a procedural injury "never ha[ve] to prove that if [they] had received the procedure the substantive result would have been altered." *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002).  The Defendant-Intervenors do not dispute that Mr. Calaway's injury is causally linked to the Corps' verification of the pipeline project, which makes his property more susceptible to damage from pipeline leaks.   Mr. Calaway's injury is thus redressable by this suit:  "An agency action that is taken without following the proper environmental review procedures can be set aside by this Court and remanded to the agency for completion of the review process." *City of Dania Beach*, 485 F.3d at

F.3d 991, 1001 (D.C. Cir. 2008).

1181.

B.      *The Plaintiffs' Claims Are Not Moot*

The Defendant-Intervenors also argue that the case is now moot in light of the progress made in constructing the pipeline.  A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (citation omitted), or when "intervening events make it impossible to grant the prevailing party effective relief," *Lemon v. Green*, 514 F.3d 1312, 1315 (citation omitted).  The "heavy burden of establishing mootness lies with the party asserting a case is moot." *Honeywell Int'l, Inc. v. Nuclear Regulatory Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010) (citation omitted).  The Defendant-Intervenors make two arguments in support of their assertion of mootness: (1) the Corps no longer has jurisdiction to remedy the harms identified by the Plaintiffs; and (2) even if the Corps retains jurisdiction over the project, as a practical matter no steps can be taken to mitigate the harms identified by the Plaintiffs. Neither argument has merit.

First, the Defendant-Intervenors argue that the Corps no longer has jurisdiction to modify the authorization for the pipeline because "Intervenors have provided unrebutted evidence that all of the regulated activities in the wetland areas are complete."  Def.-Intervs.' Reply at 5 (citing Aff. of C. Campbell, ¶ 4-5).  However, the affidavit submitted by the Defendant-Intervenors in support of this contention explicitly indicates that at least 400 feet of right of way in wetland areas have yet to be cleared, and approximately 5,727 feet of pipeline has yet to be installed in wetland areas.   Campbell Aff. ¶¶ 4-5.  The Defendant-Intervenors argue that "incidental fallback" and non-mechanized clearing of vegetation are not activities governed by NWP 12, *id.* at ¶ 5, but offer no explanation as to why the installation of the remaining 5,727 feet of pipeline

is somehow outside the scope of NWP 12.  Nor is there evidence to indicate El Dorado Water Utilities has submitted the "Certification of Compliance" form to the Corps, which would indicate that all activity authorized under nationwide permits 7 and 12 has been completed.  *See* A.R. 745.  The Defendant-Intervenors have not satisfied their heavy burden to show that all activity subject to the authorization under NWP 12 is complete, thus for purposes of this motion the Court finds the Corps retains jurisdiction to modify or revoke the authorization for the pipeline.  33 C.F.R. § 330.5(d)(2)(ii); *see Karst Envtl Educ. & Protection, Inc. v. EPA*, 475 F.3d 1291, 1298-99 (D.C. Cir. 2007) ("If [the agency] actually has authority-whether by statute, regulation, contract, or otherwise-to impose mitigation measures . . . , [Plaintiff's] claim might well remain justiciable.").

Second, the Defendant-Intervenors contend that even if the Corps has jurisdiction over the project, "the Court cannot undo what has already been done with respect to the wetlands at issue."  Def.-Intervs.' Mot. at 15.  The Defendant-Intervenors cannot credibly argue—and the Campbell Affidavit does not assert—that "the Corps required Intervenors to mitigate for all wetland impacts associated with the pipeline construction."  Def.-Intervs.' Reply at 6.  If the Plaintiffs are correct that the Corps should have conducted an environmental assessment specifically for the pipeline, the Court cannot make any determination as to the adequacy of the mitigation initially ordered by the Corps until the required environmental assessment is actually performed.  Though the Defendant-Intervenors may have established that clear-cutting the right-of-way is now complete and those wetlands have been converted from one type to another, they have not shown that nothing can be done to mitigate the ongoing effects the change in wetland type may have on the surrounding environment.

Assuming for the sake of argument that neither the Court nor the Corps could fashion a

remedy to mitigate the impact to the right-of-way for the pipeline, the Defendant-Intervenors fail to address the risk of a leak from the pipeline once the pipeline becomes operational.  *See Moreau*, 982 F.2d at 566 n.4 (finding that although the pipeline at issue was operational when the court issued its decision, "[i]n light of the continuing harm to petitioners' aesthetic interests discussed above in relation to standing, it is not the case that the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome") (citation omitted). "[E]ffective relief is still available as long as the ongoing effects the pipeline continues to have on [Mr. Calaway's] property . . . can be mitigated." *Summit Lake Paiute Tribe of Nevada v. U.S. Bureau of Land Mgmt.*, 496 F. App'x 712, 714 (9th Cir. 2012).  The threat to Mr. Calaway's property remains, and the Defendant-Intervenors do not even attempt to show that the risk of leaks cannot be remedied at this stage.  On this record, the Defendant-Intervenors failed to carry their "heavy burden" to establish the case is moot.

C. *The Corps' Authorization of the Pipeline Project Was Not Arbitrary or Capricious*

The Amended Complaint raises two claims with respect to the authorization of the pipeline under nationwide permits 7 and 12: (1) that the authorization itself was arbitrary and capricious; and (2) because the project was not authorized under any nationwide permit, the Corps was required to conduct analysis under NEPA as part of the individual permit process. Despite referencing NWP 7 in the Amended Complaint, the Plaintiffs offer no explanation (in their motion or in opposition to the cross-motions) as to why authorization of the installation of the diffuser under NWP 7 was arbitrary and capricious.  Therefore, the Court shall grant the Defendants' motion for summary judgment as to NWP 7 as conceded.  With respect to the authorization of the construction of the pipeline under NWP 12, the Plaintiffs offer two grounds on which it argues the authorization was arbitrary and capricious.  First, the Plaintiffs argue that

under the Corps' own definition of "loss of waters," the pipeline project will result in the loss of more than one-half acre of wetlands, in violation of NWP 12.  Second, the Plaintiffs argue that the Corps failed to take into account the waters that will be lost due to the permanent placement of the pipeline itself.  Neither argument is persuasive.

Nationwide permit 12 authorizes "activities required for the construction, maintenance, repair, and removal of utility lines," including wastewater pipelines, "provided the activity does no result in the loss of greater than 1/2 acre of waters of the United States."  A.R. 50.  As part of the 2007 Reissuance of Nationwide Permits, the Corps defined "[l]oss of waters of the United States" as "[w]aters of the United States that are permanently adversely affected by filling, flooding, excavation, or drainage because of the regulated activity."  A.R. 209.  "Permanent adverse effects include permanent discharges of dredged or fill material that change an aquatic area to dry land, increase the bottom elevation of a waterbody, or change the use of a waterbody."  *Id.*  The Plaintiffs do not challenge the validity of this definition, but rather argue that the pipeline at issue in this case results in the loss of more than one-half acre of waters of the United States according to the Corps' own definition.

In short, the Plaintiffs' argument is as follows: (1) the Defendant-Intervenors conceded in their application for verification from the Corps that "forested wetlands will sustain permanent impact, A.R. 438; (2) pursuant to 33 C.F.R. § 332.2, "[i]mpact means adverse effect"; therefore, (3) the Administrative Record conclusively demonstrates certain wetlands will be permanently adversely affected by the pipeline.  Thus, according to the Plaintiffs, the forested wetlands, in excess of one-half acre, will be "lost" for purposes of NWP 12.  This argument relies entirely on the definition of "impact" provided in 33 C.F.R. Part 332.  However, Part 330, which governs the issuance, modification, and revocation of nationwide discharge permits, does not purport to

incorporate the definitions provided in Part 332.  33 C.F.R. § 330.2(a) ("The definitions found in 33 CFR parts 320–329 are applicable to the terms used in this part.").  Part 332 concerns standards and criteria for the use of "compensatory mitigation," which may be required by the Corps as part of the authorization of activity under a nationwide permit, *see* 33 C.F.R. § 332.1(c), but neither Part 332 nor the definitions therein govern the interpretation of nationwide permits issued under a different part of the code of federal regulations.  The Plaintiffs fail to establish that the definition of "loss of waters" for purposes of nationwide permits actually includes the definition of "impact" provided in Part 332, or that the Corps' decision to exclude that definition is arbitrary and capricious.

Apart from their reliance on 33 C.F.R. § 332.2, the Plaintiffs' motion raises two objections to the Corps' interpretation that converting forested wetlands to emergent vegetation or scrub/shrub wetlands do not constitute "permanent adverse effects": (1) this distinction "is not part of the record of the Corps' underlying decision"; and (2) this interpretation "is inconsistent with the plain language of the regulations that applied [in 2010]."  Pls.' Reply at 7.  The record demonstrates otherwise.  The distinction between loss of *function* and loss of *waters* is contained in the very definition of "loss of waters" set forth in the 2007 Reissuance of Nationwide Permits, which the Plaintiffs do not challenge:

> Loss of waters of the United States: Waters of the United States that are permanently adversely affected by filling, flooding, excavation, or drainage because of the regulated activity.  Permanent adverse effects include permanent discharges of dredged or fill material that *change an aquatic area to dry land . . . .* The acreage of loss of waters of the United States is a threshold measurement of the impact to jurisdictional waters for determining whether a project may qualify for an NWP; *it is not a net threshold that is calculated after considering compensatory mitigation that may be used to offset losses of aquatic functions and services.*

A.R. 209 (2007 Reissuance of Nationwide Permits) (emphasis added).[6]  The Corps employed

this distinction in concluding that the pipeline project would not cause permanent loss of

wetlands, but would convert forested wetlands to other wetlands "for which compensatory

mitigation is necessary."  A.R. 1162.  The Plaintiffs offer no grounds on which the Court could

conclude that the Corps' interpretation distinguishing between the loss of wetland function and

the loss of waters is "plainly erroneous or inconsistent with the regulations being interpreted,"

thus that interpretation is controlling in this case.  *Long Island Care at Home, Ltd. v. Coke*, 551

U.S. 158, 171 (2007) (citations omitted).

The Plaintiffs offer only one other argument to support their contention that the Corps'

decision in this case was arbitrary and capricious, namely, that "[t]he Corps also fails to consider

the acreage of loss to wetlands from the permanent fill of the pipeline that will cut through the

wetlands."  Pls.' Reply at 4.  To the contrary, the Administrative Record indicates that the Corps

specifically considered the effects of the placement of the pipeline itself, but concluded that there

will be "no permanent loss of wetlands" because all soil removed for the installation of the

pipeline itself "will be returned to pre-existing contours and elevation."  A.R. 1161; *see also id.*

("A lift station will be constructed at each of the five (5) connections to the network to provide

sufficient head to transport treated water to the Ouachita River . . . .  No wetlands or Waters of

the US impacts [sic] occur at the proposed lift station construction areas.").  The Plaintiffs do not

argue that this finding was arbitrary, capricious, or otherwise in error.  Therefore, the Court finds

the Corps properly considered the potential loss of waters from the placement of the pipeline

itself.  The Corps' determination that the pipeline was authorized under NWP 12 was not

---

[6]  For this reason, the Court need not resolve the question of whether the Corps can rely on the 2012 Reissuance of Nationwide Permits to explain its rationale for the authorization of the pipeline under the 2007 Reissuance.  *See* Pls.' Reply at 5-6; Defs.' Reply at 3-4.

arbitrary, capricious, or otherwise contrary to law.[7]

## IV.  CONCLUSION

For the foregoing reasons, the Court finds the Corps properly authorized the pipeline project under nationwide permits 7 and 12.  At least one member of the Plaintiff organizations would have standing to sue in his own right, thus Save the Ouachita has standing to challenge the Corps' decision.  Despite the progress made in constructing the pipeline, the Defendant-Intervenors failed to demonstrate that the case is now moot.  However, the Plaintiffs ultimately did not meet their burden to show that the Corps' authorization of the pipeline project was arbitrary or capricious.  The Corps did not incorporate the definition the Plaintiffs' argument relies on, and the Corps properly considered the potential impact of the installation of the pipeline itself.  The Plaintiffs failed to identify any other grounds on which the Court might set aside the Corps' decision.  Therefore, the Plaintiff's [43] Motion for Partial Summary Judgment is DENIED, the Defendant-Intervenors' [61] Cross-Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, and the Defendant's [63] Cross-Motion for Summary Judgment is GRANTED.  An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE

---

[7]  Finding no basis to disturb the Corps' finding that the entire pipeline project results in no loss of waters, the Plaintiffs' contention that the pipeline project is a "single and complete" project for purposes of the NWP 12 is irrelevant: whether considered as a single and complete project or multiple projects, the pipeline project satisfies the acreage-loss threshold of NWP 12.